IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CHARLENE CARROLL,

    Plaintiff,

v.                                                     No. 1:16-cv-1139 KG/KBM

BOARD OF COUNTY COMMISSIONERS
OF RIO ARRIBA COUNTY, RANDY R.
SANCHES, BRANDON ARCHULETA
AND THOMAS R. RODELLA,

    Defendants.

MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (Qualified Immunity Raised) (Motion). (Doc. 21). Having reviewed the parties' briefing (Docs. 28, 30) and considered the applicable law, the Court GRANTS the Motion.

**I.    BACKGROUND**

    **A.    Procedural Background**

In August 2016, Plaintiff brought this action in New Mexico's First Judicial District, asserting violations of the New Mexico Tort Claims Act (First Cause of Action) and constitutional violations under 42 U.S.C. § 1983 (Second through Fourth Causes of Action). (Doc. 1-1), Ex. A. In October 2016, Defendants removed the case to this Court. *See* (Doc. 1). On January 20, 2017, Defendants moved for summary judgment as to all of the causes of actions. (Doc. 21). On March 17, 2017, the parties voluntarily stipulated to the dismissal of the Third Cause of Action (Claims Against Defendant Rodella for Supervisory Liability under 42 U.S.C. § 1983) and the Fourth Cause of Action (Claims Against the County Under 42 U.S.C. § 1983).

(Doc. 27). Hence, only the First and Second Causes of Action remain. The Second Cause of Action alleges violations of the Fourth Amendment (unreasonable seizures and use of excessive force) and the Fourteenth Amendment (denial of procedural and substantive due process, and equal protection).

The Court notes that Defendant Deputies do not argue in the instant motion that they are entitled to summary judgment on the Fourteenth Amendment claims, which are apparently premised on the alleged unlawful search of the home and Plaintiff's restraint in handcuffs as described below. Moreover, Defendant Deputies do not argue that they are entitled to summary judgment on the claims brought under the New Mexico Tort Claims Act in the First Cause of Action. Consequently, the Court does not address herein the Fourteenth Amendment claims or the claims brought against Defendant Deputies under the New Mexico Tort Claims Act.

### B. Undisputed Facts

At approximately 10:00 p.m. on Monday, August 25, 2014, Charles Canada, who lives at 6 Chicoma Avenue in Abiquiu, New Mexico, noticed an unfamiliar motor vehicle drive by his house and proceed to a neighbors' home. *See* (Doc. 21-1), Declaration of Charles Canada at Exhibit 1, sub-exhibit A. Mr. Canada estimated the distance to the neighbor's home is about one quarter mile. *See id.* Mr. Canada observed what he considered suspicious activity at the home for a period of time, so he called 911. *Id.*; *see also* (Doc. 21-2) 911/Dispatch recordings at Exhibit 2 with corresponding transcript, p. 2:1 - p. 5:17.

Mr. Canada identified himself to the 911 operator and told the operator where he resided. (Doc. 21-2) at p. 2:2-16. He advised that he had observed a person or persons walking around a neighbor's home with flashlights. *Id.* at p. 2:4-11. He also explained that the people who owned the home lived in New York; they were not at home at the time; it was 10:00 p.m.; and no one

should have been at that residence. *Id.* at p. 2:18 - p. 4:20. Mr. Canada also advised that the neighborhood was gated so whoever was at the residence must have the gate code. *Id.* at p. 3:22- p. 4:10. Mr. Canada concluded his call by providing the operator with his phone number and the gate code. *Id.*

Mr. Canada then placed a second call to 911. He advised the operator this time that something "very wrong" was going on at the neighbor's residence. *Id.* at p. 5:19 – p.8:2. The operator dispatched Rio Arriba County Sheriff's office Lieutenant Randy Sanches, and Deputies Brandon Archuleta, J. War, and Pete Chavez to the call. *See* (Doc. 21-3) Declaration of Randy Sanches as Exhibit 3, ¶¶'s 1-6; *see also* (Doc. 21-4) Declaration of Brandon Archuleta at Exhibit 4, ¶¶'s 1-3. Lieutenant Sanches and the deputies were advised that a neighbor reported suspicious behavior at a neighbor's residence, a "possible breaking and entering in progress." (Doc. 21-2 p. 8:3-14; (Doc. 21-3) ¶ 6; s*ee also* (Doc. 21-5) Espanola/Rio Arriba E-911 "10" codes.

Mr. Canada placed a third call to 911 and inquired as to the whereabouts of the deputies. He advised the operator that he was still observing a person or persons walking back and forth at the neighbor's residence with flashlights. (Doc. 21-2) p. 11:1 – p.12:6.

Mr. Canada called 911 a fourth time. He advised the operator that he saw the deputies arrive, but they were proceeding in the wrong direction. *Id.* at p. 14:17 – p. 19:25. Mr. Canada provided the operator with information to reroute the deputies to the correct location, and he stated that the person or persons he had been observing were still at the subject residence. *Id.* He explained that the subject residence was toward the end of the road on the left and illuminated with a blue light. *Id.* at p. 14:17 – p. 18:25. Dispatch relayed the updated

information to Lieutenant Sanches and the deputies, who then proceeded to the correct location. *Id.* at p. 15:20 – p. 20:11; (Doc. 21-3) ¶ 8.

Lieutenant Sanches and the deputies arrived at the residence and conducted a perimeter search. They noted several windows were open at the residence and that there were two large dogs inside. (Doc. 21-3) ¶¶ 8-11. Lieutenant Sanches and the deputies further observed that the lights were on. *See* (Doc. 28-1) ¶ 2; (Doc. 1-1), ¶ 21. Additionally, they did not find any persons moving around with flashlights. *See* (Doc. 28-1) ¶ 2; ( Doc. 1-1), ¶ 21; *see also* (Doc. 21), ¶ 25; (Docs. 21-3, 21-4). Lieutenant Sanches and the deputies also did not find broken windows, busted screens or damaged doors. (Doc. 28-1) ¶ 2; (Doc. 1-1), ¶ 21.

Lieutenant Sanches then proceeded to the back of the residence. (Doc. 21-3) ¶¶ 10-12; (Doc. 21-4) ¶ 7. While in the backyard, he heard voices at the front of the home. *Id*. He proceeded to the front of the home and observed Deputy Archuleta and Deputy Chavez speaking to an African American female, later identified as Plaintiff Charlene Carroll, who had come out to speak with the deputies. *Id*.

Plaintiff did not have her identification when they initially made contact with her. The deputies spoke with Plaintiff, and radioed back to dispatch noting "Everything seems to be 10-4, (Doc. 21-2) at 20:12, meaning "okay." (Doc. 21-5) at 2.

The deputies then attempted to enter Plaintiff's residence to "secure the premises." Plaintiff refused to allow them to enter, shutting the door believing they needed a warrant to enter the home. *See* (Doc. 28-1) ¶ 2; (Doc. 1-1), ¶¶ 23–25; (Doc. 21-3) ¶ 17; (Doc. 21-4) ¶ 10; (Doc. 28-1) ¶ 2. Deputy Archuleta then placed handcuffs on Plaintiff. (Doc. 21-3) ¶¶ 17-20; (Doc. 21-4) ¶¶ 10-11; (Doc. 28-1) ¶ 2. Shortly thereafter, Plaintiff was un-cuffed and entered the residence, accompanied by Deputy Archuleta. (Doc. 21-3) ¶¶ 21-22; (Doc. 21-4) ¶ 12; (Doc. 28-

4

1) ¶ 2.  Plaintiff retrieved her identification and Deputy Archuleta checked the interior of the residence to confirm or refute the presence of a burglary.  (Doc. 21-3) ¶ 23; (Doc. 21-4) ¶ 13; (Doc. 28-1)  ¶ 2.  Deputies also radioed the license plate information on the blue Toyota Sequoia parked in the driveway of the residence.

Dispatch contacted Mr. Canada and advised him that the deputies were talking to a female by the name of "Cynthia Carroll" but that the first name may be incorrect.  (Doc. 21-2) p. 21:3 - p.22:21.  Mr. Canada explained, "there is a lady, Charlene Carroll, who lives at the end of the street [at the] next house down. The people who own the residence are Susan – Susan Scharbach and her husband is Winter." *Id*.  Mr. Canada then inquired as to whether the person with whom the deputies were talking was African American. *Id.* at p. 21:3 - p.22:21.  Dispatch further advised Mr. Canada that the license plate on the blue Toyota Sequoia came back to a rental car, in care of "Charlene," but that the last name was "cut off." *Id.* at p. 22:23 – p. 23:22.  Mr. Canada replied that if the person was Charlene Carroll, she lives at the end of the road. *Id.* at p. 22:4 - p.24:16.  He offered to drive to where the deputies were located in order to clear up any confusion. *Id*.  Dispatch advised Mr. Canada that would be a good idea.  Mr. Canada gave a description of his vehicle. *Id*.

Dispatch advised Lieutenant Sanches that Mr. Canada was coming to their location and provided Lieutenant Sanches with a description of his vehicle. *Id.* at p. 24:18 - p.25:7; (Doc. 21-3) ¶ 26.  Dispatch also confirmed with Lieutenant Sanches that the individual at the residence was African American and advised Lieutenant Sanches "if it's Charlene Carroll, she lives down the road; she does not live there."  (Doc. 21-2) p. 25:7-25; (Doc. 21-3); (Doc. 21-3) ¶¶ 24 and 25.  Dispatch further advised Lieutenant Sanches that the owners of the residence were Susan and Winter Scharbach. *Id*.  Lieutenant Sanches replied, "Ok, this lady is irate as hell." *Id*.

Mr. Canada arrived at the location and realized he was looking at the wrong house when he reported a suspected burglary at the Scharbach residence. It turned out he was looking at Ms. Carroll's house. (Doc. 21-1); (Doc. 21-3); (Doc. 21-4) ¶ 13. Mr. Canada apologized for the mistake, as did the deputies. Lieutenant Sanches and the deputies then cleared the scene. (Doc. 21-1); (Doc. 21-2), p. 25:25 - p.28:25; (Doc. 21-3) ¶¶ 29-31; (Doc. 21-4) ¶¶ 14-15. The encounter between Plaintiff and the deputies lasted approximately 16 minutes. *See* (Doc. 21-3) ¶¶ 10-12; (Doc. 21-4) ¶ 7; (Doc. 21-1).

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted)). Once the movant meets this burden, the non-moving party is required to designate specific facts showing "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324.

The Court's role is not to weigh the evidence or determine credibility, but rather merely to assess the threshold issue of whether a genuine issue exists as to material facts. *See Anderson*, 477 U.S. at 249, 255. "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor." *Id.* at 257. Further, the Court must resolve reasonable inferences and doubts in favor of the nonmovant, and construe evidence in the

light most favorable to the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–54 (1999). However, "viewing the evidence in the light most favorable to the nonmovant, it is not enough that the evidence be merely colorable or anything short of significantly probative." *Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991) (internal quotations omitted); *see also Anaya v. CBS Broad. Inc.*, 626 F. Supp. 2d 1158, 1197 (D.N.M. 2009) ("The mere existence of a scintilla of evidence will not avoid summary judgment.").

However, summary judgment motions based upon the defense of qualified immunity are reviewed differently from other summary judgment motions. This is because qualified immunity is "designed to protect public officials from spending inordinate time and money defending erroneous suits at trial." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008). Therefore, when a public official is entitled to qualified immunity, the entitlement relieves the official from bearing any of the burdens of litigation, including discovery. *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009). The United States Supreme Court "has directed the lower federal courts to apply qualified immunity broadly, to protect from civil liability for damages all officers except the plainly incompetent or those who knowingly violate the law," in order to avoid unduly inhibiting officers in performing their official duties. *Wilson v. City of Lafayette*, 510 F. App'x 775, 780 (10th Cir. 2013) (internal quotation marks omitted). The qualified immunity standard allows government officials "ample room for mistaken judgments," shielding them from liability for reasonable error. *Applewhite v. U.S. Air Force*, 995 F.2d 997, 1000 (10th Cir. 1993) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). Thus, qualified immunity is "applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Determining whether the allegedly violated right was "clearly established" depends on whether "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (quotations omitted). While the plaintiff need not locate "a case directly on point," nevertheless "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

### III.   ANALYSIS OF PLAINTIFF'S SECTION 1983 CLAIMS (SECOND CAUSE OF ACTION)

Plaintiff's Section 1983 cause of action alleges that Lieutenant Sanches and former Deputy Archuleta (collectively, Defendant Deputies) violated Plaintiff's Fourth and Fourteenth Amendment rights under color of their state authority when they searched Plaintiff's home and restrained her in handcuffs. (Doc. 1-1) at 8-9. In seeking summary judgment, Defendant Deputies assert that they are entitled to qualified immunity from Plaintiff's Fourth Amendment claims because their conduct and interaction with Plaintiff did not violate clearly established Fourth Amendment rights. (Doc. 21) at 13-20. Plaintiff responds that the Defendant Deputies' conduct in entering and searching her home as well as the excessive force used in handcuffing her during her detention both are violations of her clearly established Fourth Amendment rights, thus precluding summary judgment. (Doc. 28) at 11-24.

8

### A. Qualified Immunity as to the Search of the Home

The Fourth Amendment protects citizens from "unreasonable searches and seizures" by government officials. U.S. Const. Amend. IV.[1] It is a basic principle of Fourth Amendment law that, when searching within a home, "a warrant must generally be secured." *Kentucky v. King*, 563 U.S. 452, 459 (2011); *United States v. Scroger*, 98 F.3d 1256, 1259 (10th Cir. 1997). However, the warrant requirement is subject to several reasonable exceptions. *King*, 563 U.S. at 459 (citing *Brigham City Utah v. Stuart*, 547 U.S. 398, 403 (2006)). These exceptions include consent of the homeowner to a search or the existence of exigent circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Stuart*, 547 U.S. at 403.

Consent of an authorized party provides officers the ability to search the area or items consented to regardless of whether the officers have obtained a warrant or even established probable cause. *Schneckloth*, 412 U.S. at 219 (holding that consent to search is well-defined exception to general requirement that police possess warrant or probable cause). However, consent to search cannot be coerced and where consent is given while being unlawfully detained, the consent is considered tainted and cannot render a search lawful. *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054-55 (10th Cir. 1994) (holding that consent must be given voluntarily and must not be tainted by unlawful arrest).

Here, the parties dispute whether Plaintiff gave voluntary consent for deputies to enter and search her home. Plaintiff contends that she agreed to allow deputies into her home only after (1) she was handcuffed for refusing to cooperate with the investigation, (2) she was told

---

[1] These constitutional protections are incorporated against states and their officials via the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 654 (1961).

that deputies would enter the house regardless of her refusal to consent to a search of her home, and (3) she was threatened with ramifications of forceful arrest if she did not consent to the search. (Doc. 28) at 17-20. On the other hand, Defendant Deputies assert that, while Plaintiff was briefly handcuffed, she voluntarily negotiated to allow one officer, Deputy Archuleta, to enter the home with her so he could check for signs of burglary while she retrieved her driver's license to verify her identity. (Doc. 21) at 16; (Doc. 30) at 11-12. Defendants further contend that Plaintiff was not subjected to physical mistreatment, use of violence or threats of violence, promises or inducements, or deception or trickery. (Doc. 21) at 16. These differing characterizations of the circumstances regarding whether Plaintiff voluntarily consented to a search of her home support a finding that those circumstances remain disputed and, thus, cannot form the basis for judgment as a matter of law with respect to Defendant Deputies' search of Plaintiff's residence. However, summary judgment may still be appropriate if undisputed facts establish an alternative legal basis for Defendant Deputies' warrantless entry into the home. *King*, 563 U.S. at 452 (holding that presumption that warrantless searches are unreasonable may be overcome by searches pursuant to exigent circumstances).

As noted above, a warrantless search is also reasonable under the Fourth Amendment where exigent circumstances exist. *Stuart*, 547 U.S. at 403. In addressing facts similar to the present dispute, courts within the Tenth Circuit have held that responding to a report of possible burglary give rise to exigent circumstances such that a warrantless entry is authorized. *Walker v. Disner*, 50 Fed. Appx. 908, 910 (10th Cir. 2002) (citing *United States v. Tibolt*, 72 F.3d 965, 970-71 (1st Cir. 1995)); *see also United States v. Dighera*, 2 F. Supp. 2d 1377, 1379 (D. Kan. 1998) ("it appears well-settled that responding to . . . reports of a possible burglary is an exigent circumstance authorizing the police to make a warrantless entry to a home"); *Sirio v. Lotspeich*,

2006 WL 2331085, at *2 (D. Colo.) ("It is clear that exigent circumstances justified defendant's entry into the home without a warrant. A neighbor had reported that the owner of the home was out of town and that no one was supposed to be in the house") (internal citations omitted). These cases are persuasive here.

Specifically, the undisputed facts establish that Plaintiff's neighbor, Mr. Canada, called 911 multiple times to report suspicious activity and a possible burglary at the home which he mistakenly believed belonged to the Scharbachs. *See* (Doc. 21-1); (Doc. 21-2). Mr. Canada adamantly explained that the house in question belonged to the Scharbach family and that no one was authorized to be there. He remained adamant even after being informed that the individual with whom deputies were speaking was Plaintiff. *See* (Doc. 21-2) pp. 21:3 - p.22:21, 22:4 - p.24:16. These calls appeared credible and contained specific facts indicating a possible break in, including the report of an individual walking around the house with a flashlight at 10:00 p.m. when no one was supposed to be there. *Id.* at p. 2:4-11, p. 2:18 - p. 4:20. The 911 Dispatcher relayed this information to Defendant Deputies, who were entitled to rely in good faith on such information even though it was later determined to be inaccurate. *See* (Doc. 21-3) ¶¶ 6, 8, 24-26; *see also Miller v. City of Nichols Hills Police Dep't*, 42 F. App'x 212, 216 (10th Cir. 2002) ("officers were entitled to rely on the reasonably trustworthy information provided to them by the dispatcher, even though the information was later determined to be faulty").

Similarly, Plaintiff's interaction with the deputies and her insistence that she was the homeowner did not extinguish the exigent circumstance or moot information to the contrary. This is because she was unable to prove her identity until she retrieved her driver's license from inside the home. *See* (Doc. 28) at 8, (Doc. 28-1) ¶ 2; (Doc. 1-1), ¶¶ 22, 28 (Plaintiff did not have her identification on her person when police initially made contact with her); *see, e.g., United*

*States v. Johnson*, 9 F.3d 506, 509 (6th Cir. 1993) (holding that exigent circumstance justified warrantless entry where officers responded to reported burglary and encountered individual who was unable to provide identification which proved she lived in home). Accordingly, Defendant Deputies were authorized to enter Plaintiff's home because exigent circumstances existed and regardless of her consent. This conduct does not violate Plaintiff's clearly established Fourth Amendment rights.

The Court acknowledges that there are uncontested facts establishing that no burglary was ever in progress, to wit, the lights of the residence were on; no one was found to have been circling the house with flashlights; and there were no broken or damaged windows, screens or doors found. *See* (Doc. 28) at 8, (Doc. 28-1) ¶ 2; (Doc. 1-1) ¶ 21. Nevertheless, these facts are not determinative in the court's qualified immunity analysis. As discussed above, qualified immunity is broadly applied to shield officers from suit even if their conduct was the result of mistaken judgment or reasonable error. *Applewhite*, 995 F.2d at 1000. Thus, while some evidence at the scene could have led the deputies to conclude that no burglary had occurred, these facts do not establish that the deputies were plainly incompetent or that they knowingly violated the law. *See Wilson*, 510 F. App'x at 780. Accordingly, the Defendant Deputies are entitled to qualified immunity as to the Fourth Amendment unlawful search claim. Therefore, summary judgment is appropriate on that claim.

### B. Qualified Immunity as to Plaintiff's Restraint in Handcuffs

Plaintiff also asserts that Defendant Deputies' conduct in handcuffing her during her brief detention constitutes excessive force, in violation of her Fourth Amendment rights. (Doc. 28) at 11-16. Therefore, the Court examines whether Defendant Deputies violated Plaintiff's Fourth Amendment rights and whether these rights were clearly established.

It is well-settled that even brief or minor *Terry* detentions must at least be supported by a reasonable, objective suspicion of criminal activity. *Florida v. Royer*, 460 U.S. 491, 498 (1983); *United States v. Fox*, 600 F.3d 1253, 1259 (10th Cir. 2010) (holding that individual may not be detained even momentarily without reasonable grounds). Moreover, any force used in such a detention must be proportional to the need to maintain the *status quo* or to ensure officer safety. *Cortez v. McCauley*, 478 F.3d 1108, 1131 (10th Cir. 2007) (stating it is well established that officers should know to use only force necessary to maintain safety and preserve *status quo*). An excessive amount of force can transform an otherwise legitimate investigatory detention into an arrest requiring a showing of probable cause. *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) (holding encounter between police and individual which goes beyond limits of *Terry* stop may be constitutionally justified only by probable cause or consent). The Tenth Circuit has explained that the use of handcuffs, standing alone, does not automatically transform a detention into an arrest. *Plascencia v. Taylor*, 514 F. App'x 711, 717 (10th Cir. 2013); *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030 (10th Cir. 1997) (holding "a *Terry* stop does not automatically elevate into an arrest where police officers use handcuffs on a suspect or place him on the ground"). However, the use of handcuffs must be justified because the use generally exceeds the scope of an investigatory detention (or *Terry* stop). *Cortez*, 478 F.3d at 1116 (stating government to demonstrate facts available to detaining officer would warrant man of reasonable caution to believe that action taken was appropriate); *Lundstrom v. Romero*, 616 F.3d 1108, 1122 (10th Cir. 2010) (finding handcuffing unarmed woman who was cooperating with police was not reasonable during investigatory detention).

The undisputed facts in this case show that the use of handcuffs was appropriate in light of the information available to Defendant Deputies. At the time she was briefly handcuffed,

Plaintiff was a suspect of a reported burglary. The questioning took place late at night and over a 16 minute period. *See* (Doc. 21-3) ¶¶ 10-12; (Doc. 21-4) ¶ 7; (Doc. 21-1). Because of the serious nature of the crime of burglary, an officer with reasonable suspicion may also reasonably assume that a suspect poses a present danger. *See Davis v. City of Aurora*, 705 F. Supp. 2d 1243, 1259 (D. Colo. 2010) (stating that use of handcuffs while responding to reported burglary did not transform detention into arrest due to serious nature of crime); *United States v. Bullock*, 510 F.3d 342, 346 (D.C. Cir. 2007) (holding that if officer possesses reasonable suspicion that detained suspect committed a serious crime, including burglary, it logically follows that officer may reasonably presume suspect may be armed and dangerous). Indeed, the use of handcuffs during a detention is especially justified for safety reasons where the reported burglary occurs at night and if the duration of the use is short. *See, e.g., Davis*, 705 F. Supp. 2d at 1258 (stating that environmental conditions, including time of day, is important consideration in evaluating reasonableness of *Terry* stop); *Fuchs v. Sanders*, 659 F. Supp. 2d 1136, 1146 (D. Colo. 2009) (holding that use of forceful tactics did not transform investigatory detention into unlawful arrest due to brevity of detention).

In addition, Plaintiff admitted to trying to prevent the deputies from entering into the home by shutting the door, despite their legal right to enter under the exigent circumstances doctrine, as explained *supra*. *See* (Doc. 28) at 5, (Doc. 28-1) ¶ 2. While Plaintiff cannot be required to consent to a search, her mistaken belief that police needed a warrant in this circumstance did not allow her to thwart the deputies from performing a search which they were, in fact, lawfully authorized to carry out. In such instances, police are reasonably entitled to handcuff a suspect in order to maintain the *status quo* and prevent the suspect from interfering with officers entering and securing the house. *See, e.g.*, *United States v. Navarrete-Barron*, 192

F.3d 786, 791 (8th Cir. 1999) (holding that it is reasonable to handcuff individuals during *Terry* stop to allow officers to conduct lawful search immediately and without interference); *Michigan v. Summers*, 452 U.S. 692, 712 (1981) (investigatory detention is justified to help police effectuate lawful search). Accordingly, Defendant Deputies did not violate Plaintiff's clearly established constitutional rights by briefly placing her in handcuffs during the course of an investigatory detention until she agreed not to interfere with their entry into the residence. Accordingly, Defendant Deputies are entitled to qualified immunity and summary judgment on the Fourth Amendment unlawful handcuffing claim as well.

IT IS ORDERED that Defendants' Motion for Summary Judgment (Qualified Immunity Raised) (Doc. 21) is granted in that

1. summary judgment will granted in favor of Lieutenant Sanches and former Deputy Archuleta as to the Fourth Amendment claims raised in the Second Cause of Action; and

2. those claims will, thus, be dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE